UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 APR 14 PM 2: 13

U.S. DISTRICT COURT
N.D. OF ALABAMA

MIKEL NANCE,                     )
                                 )
        Plaintiff,               )
                                 )
vs.                              )   Civil Action No. CV-98-S-2183-NE
                                 )
CAMPBELL ENGINEERING, INC.,      )
                                 )   ENTERED
        Defendant.               )
                                     APR 1 4 2000



MEMORANDUM OPINION

This action is before the court on defendant's renewed motion

for summary judgment (Doc. No. 44).   Upon consideration of the

motion, briefs, evidentiary submissions,[1] and pleadings, this court

concludes the motion is due to be granted, and that plaintiff's

claims are due to be dismissed with prejudice.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant

part, that summary judgment not only is proper, but "shall be

rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as

---

[1] Defendant submitted an entire evidentiary submission in support of its
renewed motion for summary judgment (Doc. No. 46).   Plaintiff provided a
supplemental evidentiary submission (Doc. No. 55) to that which he initially
submitted in opposition to summary judgment (Doc. No. 29).   The court bases its
findings *infra* on a review of all the above submissions.

a matter of law." The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally Celotex Corporation v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by showing the court there is an absence of evidence to support the non-movant's case. *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not

2

prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

3

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Defendant, Campbell Engineering, Inc., a company based in Huntsville, Alabama, "provides engineering and precision machining services on a contract basis to larger firms in the aerospace industry."[2] Campbell Engineering hired plaintiff, Mikel Nance, "to construct work tables, cabinets, and similar structures" for a new building Campbell Engineering had erected on its property.[3] Nance, an African-American, began his employment with Campbell Engineering on August 25, 1997. As a member of Campbell Engineering's Maintenance Department, Nance's supervisor was Johnny Humphrey, who also is of African-American heritage.

Pursuant to company policy, Nance was considered a "probationary" employee for his first ninety days of employment. Richard A. Campbell, owner of Campbell Engineering, stated in affidavit that, "[w]hen we hired Mr. Nance, we expected him to become a regular employee, but initially Mr. Nance's employment, as

---

[2] Affidavit of Richard A. Campbell, attached as Exhibit A to defendant's evidentiary submission in support of its renewed motion for summary judgment, at ¶ 1.  Campbell and his wife own and manage Campbell Engineering.

[3] *Id.* ¶ 2.

4

[with] all new employees, was 'at will.'"[4]  According to Campbell and Humphrey, Nance's initial carpentry work was unsatisfactory. Based on the fact that "several of the tables Mr. Nance had constructed were unstable and needed reinforcement [while other creations] ... had to be reworked," Campbell concluded that Nance had misrepresented his level of carpentry skill.[5]  Humphrey echoed Campbell's assessment of Nance's carpentry skills, observing that some of Nance's work was not "up to standard" and "could have been done ... better."[6]

Campbell stated in affidavit that "the size of Campbell

---

[4] *Id.* ¶ 15.

[5] *Id.* ¶ 14.  An examination of the evidence in this case reveals that Nance made a number of material misrepresentations on the employment application he submitted to Campbell Engineering.

[6] Deposition of Johnny Humphrey, attached as Exhibit G to defendant's evidentiary submission in support of its renewed motion for summary judgment, at 15.  Nance counters these assertions with the affidavit of Trea Gilbreath, another Campbell Engineering employee. Gilbreath states that Nance did quality work:

> I recall that as part of his work duties, Mr. Nance replaced a pump in a lathe, which required the re-wiring of 13 different wires. At the time I (voluntarily) left my employment with Campbell Engineering, the pump was still working well. I further recall that there had been a written work order for Mr. Nance to replace the pump.
>
> I also recall Mr. Nance constructing certain work tables as part of his job duties at Campbell Engineering.  I personally observed the tables, which were both well-built and functional and did not need rebuilding.

Affidavit of Bryant Trea Gilbreath, attached as Exhibit 1 to plaintiff's supplemental evidentiary submission in opposition to summary judgment.  It is undisputed that Gilbreath had no supervisory responsibility for Nance's work, and merely offered his lay opinion as to workmanship.

Engineering's workforce fluctuates when work load varies due to varying demands under our contracts with our customers."[7]   A reduction-in-force occurred shortly after Nance's hiring, based on the company's need "to reduce ... overhead costs as a result of declining orders [from larger firms in the aerospace industry]."[8] Nance was terminated as part of this reduction-in-force on October 7, 1997.  Between September 26, 1997, and October 22, 1997, five other employees, in addition to Nance, also were laid off: all were Caucasians.  Further, "[d]uring the five-month period after Mr. Nance was hired, a total of 25 employees, in addition to Mr. Nance, were laid off for economic reasons.  Twenty-four (24) of those who were terminated were white."[9]   Campbell explained Nance's termination in the following manner:

> I selected Mr. Nance for layoff in accord with our practice of laying off the most recently hired employees in the jobs affected by the layoff.  There were no employees who were performing the same type work as Mr. Nance who were retained after the layoffs in September/October 1997 and whose length of service with Campbell was less than Mr. Nance's.[10]

Nance filed a charge of discrimination with the EEOC soon after his separation from Campbell Engineering, asserting:

---

[7] Campbell affidavit ¶ 7.

[8] *Id.* ¶ 8.

[9] *Id.* ¶ 10.

[10] *Id.* ¶ 11.

> I believe that I was hired by my employer in order to meet a quota for minority employees and that I was terminated immediately after the government inspection/audit was completed. My employer gave me two (2) separate lay-off notices, one indicated the reason for termination as being "to reduce indirect overhead cost" and the other stating "due to a lack of work in the building/maintenance repair area." I believe that these reasons are merely a pretext because I was in the middle of several projects which would have kept me busy for several more months and because a new white employee was hired to replace me shortly after my termination. Furthermore, I (along with other black employees) was repeatedly harassed by Leonard, a white employee, who used racial slurs and made racist remarks to me. [11]

The "new white employee" whom Nance asserted had been "hired to replace" him was Allen Hunter. He was hired by Campbell Engineering several weeks after Nance's termination.[12] Even so, Hunter devoted approximately sixty percent of his time "to electrical work, primarily the wiring of new machines that Campbell Engineering was installing as part of its 1997 expansion."[13] Nance admitted in deposition that he lacked training or experience in electrical work. Moreover, Hunter was terminated barely three

---

[11] Exhibit 3 to plaintiff's evidentiary submission in opposition to summary judgment.

[12] Hunter stated in affidavit that he was approached by Leonard Rogers, Campbell Engineering's Maintenance Supervisor at the time, about working for the company after "Nance had already been laid off." Affidavit of Allen Hunter, attached as Exhibit 1 to plaintiff's evidentiary submission in opposition to summary judgment.

[13] Affidavit of Allen Hunter, attached as Exhibit D to defendant's evidentiary submission in support of its renewed motion for summary judgment, at ¶ 2.

months after being hired, as part of the same, ongoing reduction-in-force that had led to Nance's dismissal.

With respect to Nance's accusation that he was hired in response to a "quota" requirement initiated by a governmental audit, Mr. Campbell stated:

> There is no truth in Mr. Nance's claims in that regard. In fact, the only audit at Campbell Engineering during Nance's employment was an on-site quality assurance program survey conducted by British Standard Institute (BSI) for the purpose of achieving ISO 9001 quality system certification.  The ISO 9001 audit had nothing to do with "quotas" or other workforce diversity issues. The ISO "audit" is not governmental, it is private, and it is <u>not</u> concerned with the racial diversity of an employer's workforce.  It is concerned only with quality control processes.[14]

Nance elaborated on his claims of harassment in deposition. He said that David Bailey, Campbell Engineering's Shop Foreman, called him a "black bitch" on one occasion.  Nance complained of Bailey's statement to Elizabeth Nunley, the Human Resources Manager for Campbell Engineering.  Bailey eventually apologized to Nance

---

[14] Campbell affidavit ¶ 28 (emphasis in original).  Campbell further added that his company "is subject to audits by the Defense Contract Audit Agency," which "is responsible for insuring that defense contractors and subcontractors are not overcharging the government for work under those contracts." *Id.* ¶ 29 (noting that "DCAA does not audit for workforce diversity or minority utilization issues").  Finally, Campbell recognized that his company was subject to Executive Order 11246, "which prohibits discrimination against minorities and females by government contractors and subcontractors ...." *Id.* ¶ 30.  Even so, Campbell averred that "[a]t no time during the time we were considering Mr. Nance for employment, or thereafter, were we under any notice of audit by the Office of Federal Contract Compliance Programs ..., which has responsibility for the administration of Executive Order 11246, nor was Mr. Nance employed for the purpose of meeting any sort of quota imposed by the OFCCP." *Id.*

for making the comment, indicating that he was merely joking. Nance also stated that he "talked to [Nunley] about the slurs that was going around in the facility ...."[15]  Trea Gilbreath, another African-American employee of Campbell Engineering, said that Bailey and Leonard Rogers, another Caucasian supervisor, consistently made racial jokes and puns.[16]  He also complained to Nunley.  Gilbreath further testified that racial comments were made about Nance, outside of his presence, approximately three or four times during Nance's tenure at Campbell Engineering; the only specific comment he remembered, however, was Bailey's description of Nance as a "black bitch."[17]  Finally, Gilbreath remarked that the term "nigger"

---

[15] Deposition of Mikel Nance, attached as Exhibit H to defendant's evidentiary submission in support of its renewed motion for summary judgment, at 225.  Nance also stated in deposition that he complained to Campbell about receiving improper work assignments from Leonard Roberts.

[16] Specifically, Gilbreath recalled Rogers stating that he was not prejudiced, because he had black-wall tires on his car.  See Deposition of Trea Gilbreath, attached as Exhibit 6 to plaintiff's evidentiary submission in opposition to summary judgment, at 50.

[17] Nance and Gilbreath, as well as Campbell, also recall a racial incident that occurred before Nance was hired.  According to Campbell:

> I do recall one incident that occurred before Mr. Nance was hired that had racial overtones.  Periodically, my wife and I buy a pizza for our employees' lunch.  We usually announce our plans to do so several days in advance with a bulletin board notice that has graphics that depict a group of employees.  Several months, maybe a year before we hired Mr. Nance, someone circled the faces of African Americans on one of those notices and wrote "Leonard's crew."  Leonard Rogers, the Maintenance Supervisor at the time, got very angry about it, reported to me that he immediately removed the notice, but had been unable to determine who was responsible.

Campbell affidavit ¶ 35.

was used "[q]uite a number of times" by Caucasian employees.

As a separate paragraph in his charge of discrimination, Nance stated:

> In support of my charge, I would also show that Johnnie Humphreys, another black employee, was given the new position of supervisor over my maintenance position. Immediately after the [alleged government] inspection was completed, Mr. Humphreys was demoted and returned to general maintenance (i.e., sweeping floors and changing oils). Mr. Humphreys was replaced by Leonard, a white employee.[18]

Nance alludes to the elevation of Leonard Rogers to the position of Maintenance Supervisor around the time of his termination. Humphrey was eventually returned to that position, and stated the following in deposition:

> Q.   When you were changed back from being a supervisor to a non-supervisory job, did Mr. Campbell leave your compensation the same?
>
> A.   Yes, he did.
>
> . . .
>
> Q.   Do you think that your race had anything to do with the decision to move you from being a supervisor to not being a supervisor?
>
> A.   No, I don't.[19]

Nance commenced the present action on August 27, 1998.

---

[18] Exhibit 3 to plaintiff's evidentiary submission in opposition to summary judgment.

[19] Humphrey deposition at 27.

## III. DISCUSSION

Nance contends his termination by Campbell Engineering violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981,[20] and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*[21] With respect to Title VII, Nance brings claims for disparate treatment, as well as a racially hostile work environment.[22]  Because Nance's claim under Section

---

[20] That statute provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

[21] Nance's original complaint (Doc. No. 1) also alleged Campbell Engineering had violated 42 U.S.C. § 1983.  In his amended complaint (Doc. No. 13), however, Nance "delete[d] any and all references to '42 U.S.C. § 1983' made in any part of said complaint."  Amended complaint ¶ 1.

[22] Plaintiff also attempts to state a claim for retaliation in violation of Title VII and 42 U.S.C. § 1981 in his response to defendant's interrogatories and brief in opposition to summary judgment.  Such a claim is not apparent from the face of plaintiff's amended complaint.  Not only do the facts fail to establish such a claim, this court is under no duty to read additional causes of action into a plaintiff's complaint. *See Maniccia v. Brown*, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999); *see also* Scheduling order entered by this court on October 29, 1998 (Doc. No. 7), providing in paragraph one that "[n]o causes of action, defenses, or parties may be added after January 29, 1999."

1981 arises out of the same set of facts as his Title VII claim, the Title VII framework of analysis will be employed to address that claim as well. *See Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980);[23] *see also Walters v. City of Atlanta*, 803 F.2d 1135, 1143 n.5 (11th Cir. 1986) (citing *Whiting* for the proposition that "[w]hen § 1981 is used as a basis for relief parallel to that provided by Title VII, the elements of a § 1981 claim are identical to the elements of a Title VII claim"). Accordingly, this court shall first address the propriety of Nance's Title VII/Section 1981 claims, and then turn to an analysis of his Fair Labor Standards Act claim.

## A.   Title VII/Section 1981 Claims

### 1.   Disparate treatment

42 U.S.C. § 2000e-2(a)(1) provides that it shall be an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." The Supreme Court articulated the theory undergirding disparate

---

[23] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

treatment claims in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.  Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

*Id*. at 335-36 n.15, 97 S.Ct. at 1854-55 n.15.  A plaintiff may establish disparate treatment with either direct or circumstantial evidence.  Only the most blatant remarks indicating a discriminatory animus constitute direct evidence.  *See generally Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999).  Nance produced no direct evidence of disparate treatment.  Even though certain scurrilous statements made by named and unnamed employees of Campbell Engineering will be discussed later in the context of, and as proof of, Nance's racially hostile work environment claim,[24] none of such statements are attributable to defendant's decisionmaker, Richard A. Campbell.[25]  *See Trotter v. Board of Trustees of the University of*

---

[24] *See infra* pages 23-24.

[25] *See* Campbell affidavit ¶ 8 ("I made the decision to terminate Mr. Nance on October 7, 1997, as part of that reduction in force.").  There is no evidence that the two individuals Nance targets as making racially hostile statements,

*Alabama*, 91 F.3d 1449, 1453-54 ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."). Further, there is no evidence that Richard Campbell harbored a discriminatory animus toward Nance, or any other African-American employee of Campbell Engineering. *See Hill v. Metropolitan Atlanta Rapid Transit Authority*, 841 F.2d 1533, 1539 (11th Cir.) (requiring a plaintiff to draw a correlation between direct evidence and the discrimination that forms the basis of his claim), *amended on other grounds*, 848 F.2d 1522 (11th Cir. 1988). Racial statements uttered in the workplace by other Campbell Engineering employees who were not involved in the challenged employment action, therefore, are appropriately addressed in the context of Nance's hostile work environment claim, not his disparate treatment claim.

Accordingly, this court must analyze plaintiff's circum-stantial evidence of race discrimination under the burden-shifting framework originally articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that tripartite scheme, the plaintiff

---

David Bailey and Leonard Rogers, either directly supervised Nance or were instrumental in the decision-making process that culminated in his discharge from the company.

14

has the initial burden of establishing a *prima facie* case of discrimination. If plaintiff does so, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. If that burden is carried, the plaintiff must produce evidence indicating that defendant's stated reason is mere pretext for unlawful discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff shoulders the ultimate burden of persuasion of showing that defendant unlawfully discriminated against him. *See Wright v. Southland Corporation*, 187 F.3d 1287, 1292 (11th Cir. 1999) ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

Here, plaintiff fails to establish a *prima facie* case of race discrimination. Additionally, even assuming plaintiff were able to

15

make such a showing, nothing in the record before this court rebuts defendant's legitimate, nondiscriminatory reasons for selecting him for lay-off.

In a reduction-in-force case, a plaintiff must show the following to establish a *prima facie* case: (1) that he is a member of a protected class; (2) that he was terminated; (3) that he was qualified for his current, or another position at the time of discharge; and (4) that the employer intended to discriminate on the basis of plaintiff's race when failing to consider him for retention or another position. *See Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995) (national origin discrimination case).[26]  Nance obviously satisfies the first two elements.  Moreover, this court will assume for the sake of discussion that he was qualified for the position he held, or for some other position in the company on the date of discharge.[27] Plaintiff's attempt to establish a *prima facie* case nevertheless

---

[26] *Cf. Mitchell v. USBI Company*, 186 F.3d 1352, 1354 (11th Cir. 1999) ("In order to state a prima facie case of age discrimination involving a reduction-in-force, a plaintiff must demonstrate that: (1) he was a member of the age group protected by the ADEA and was adversely affected by an employment decision; (2) he was qualified for his current position or to assume another position at the time of discharge; and (3) there is evidence from which a reasonable factfinder could conclude that the employer intended to discriminate on the basis of age in making its employment decision.").

[27] Such an assumption clearly runs against the grain of the evidence, however, in view of the material misrepresentations on the employment application Nance submitted to Campbell Engineering and the evidence of questionable workmanship.

fails at the fourth element.   In order to show that Campbell Engineering's selection of him for termination reflected an intent to discriminate, Nance must proffer evidence "indicating that the defendant singled him ... out for discharge based on unlawful discrimination." *Ellis v. Wal-Mart Stores, Inc.*, 952 F. Supp. 1522, 1527 (M.D. Ala. 1996) (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).   Satisfactory evidence on that issue would include proof that Campbell Engineering retained similarly-situated Caucasian employees with equal or less qualifications than Nance after the reduction-in-force. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).   Nance claims the retention of David Bailey and Leonard Rogers by Campbell Engineering is such evidence.   Bailey, a Shop Foreman with eighteen months of experience, and Rogers, a Maintenance Supervisor with thirteen years of experience, are not proper comparators, however.

Nance also contends that the subsequent hiring of Allen Hunter reflected an intent to discriminate.   It is not contested, however, that the majority of work performed by Hunter was electrical in nature, whereas Nance's work focused on carpentry.[28]   Further, the

---

[28] Nance also complains that Hunter received a higher rate of pay than him, $10.00 per hour as opposed to $8.00 per hour, and was given the opportunity to work overtime.   Hunter is not similarly situated to Nance, however, thereby

evidence does not reflect that Hunter was hired to "fill" Nance's position.  Finally, Hunter also was terminated, in January of 1998, as part of the continuing reduction-in-force.  Viewing the record as a whole, therefore, this court concludes Nance has failed to establish a *prima facie* case of race discrimination relating to the reduction-in-force.

Moreover, even assuming *arguendo* that Nance had established a *prima facie* case, this court further concludes he has not adduced sufficient evidence to cast doubt on the truthfulness of Campbell Engineering's legitimate, nondiscriminatory reasons for termination.

The company's stated reasons for terminating Nance were clearly explained by Richard Campbell in affidavit: *e.g.*, owing to a dearth of orders by its customers, Campbell Engineering was forced to lay-off a number of employees in an effort to reduce overhead costs; Nance was among the most recently hired employees — indeed, he had not completed his probationary period; and, of some 26 employees laid-off during a five month period from the end

---

possibly explaining the disparity in wages.  In any event, Nance offered no evidence to refute Campbell's statement that "overtime assignments are made on the basis of need and priority of work," and that "[s]ince the electrical work that we assigned to Allen Hunter was a higher priority than the carpentry work performed by Mr. Nance, it would not surprise me that Mr. Hunter was assigned to work more overtime during his employment than was Mr. Nance."  Campbell affidavit ¶ 23.

of 1997 into the beginning of 1998, only two (counting Nance) were of African-American heritage.

Nance attempts to cast doubt upon defendant's stated reasons by simply asserting, without supporting evidence, that Campbell Engineering was the subject of a racial diversity audit at the time of his hiring, and that he was terminated once the audit concluded. The record in this case utterly fails to substantiate that claim, however.   Around the time of Nance's employment with Campbell Engineering, it <u>was</u> the subject of a "quality assurance" audit, but that audit was unrelated to racial diversity issues.   Nance has made no offer of proof, only unfounded accusations, to rebut Richard Campbell's statement that Campbell Engineering was in no way subject to racial diversity or "quota" audits during the relevant time period, and that the reduction-in-force was due to business necessity. *See Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its action."). Put another way, no genuine issue of fact exists regarding the truth of Campbell Engineering's non-discriminatory rationale, because Nance has failed to demonstrate "'such

19

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could ... find them unworthy of credence.'" *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)).

For the foregoing reasons, summary judgment is due to be granted on Nance's disparate treatment claims under Title VII and 42 U.S.C. § 1981.

### 2.   Racially hostile work environment

The Supreme Court concluded, in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), that "[t]he phrase 'terms, conditions, or privileges of employment' [in 42 U.S.C. § 2000e-2(a)(1)] evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Id.* at 64, 106 S.Ct. at 2404 (quoting *Los Angeles Department of Water and Power vs. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978)).   Encompassed within that "spectrum" is the right of individuals to work in an environment that is not discriminatorily hostile or abusive.   *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367,

370, 126 L.Ed.2d 295 (1993). According to the *Harris* court: "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2405) (internal citations omitted).[29]

The Eleventh Circuit summarizes the elements of a hostile work environment claim as follows:

> (1) the employee must belong to a protected group; (2) the employee must have been subject to unwelcome [racial] harassment; (3) the harassment must have been based on [race]; (4) the harassment must have been sufficiently severe or pervasive to alter the conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment either directly or indirectly.

*Mendoza v. Borden, Inc.*, 158 F.3d 1171, 1175 (11th Cir. 1998) (addressing Title VII sexual harassment claim). With regard to the fourth element, a plaintiff must show not only that he subjectively perceived his work environment to be hostile, but also that the conduct creating this environment was sufficiently severe or pervasive to make his perception objectively reasonable.

---

[29] The Supreme Court reiterated in *Harris* that Title VII liability for a hostile work environment "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

21

> Conduct that is not severe or pervasive enough to create
> an objectively hostile or abusive work environment—an
> environment that a reasonable person would find hostile
> or abusive—is beyond Title VII's purview.  Likewise, if
> the victim does not subjectively perceive the environment
> to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no
> Title VII violation.

*Harris*, 510 U.S. at 21-22, 114 S.Ct. at 370.  The *Harris* Court

sketched a short list of factors, none of which are dispositive,

that aid in determining whether a work environment is "hostile":

> These may include the frequency of the discriminatory
> conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive
> utterance, and whether it unreasonably interferes with an
> employee's work performance.

*Id.* at 23, 114 S.Ct. at 371 (concluding that whether a work

environment is hostile depends on an analysis of "all the

circumstances").[30]

A review of the evidence in this case confirms that Nance has

failed to show that any alleged harassment at the hands of Campbell

Engineering employees was sufficiently severe or pervasive as to

alter the conditions of his employment.  *See Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662

---

[30] According to the Eleventh Circuit in *Mendoza*, "'[a] hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits ....'" *Mendoza*, 158 F.3d at 1176 (quoting *Vance v. Southern Bell Telephone & Telegraph Company*, 863 F.2d 1503, 1510-11 (11th Cir. 1989)).

(1998) (noting that "off hand comments" and "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"). Nance's best summary of the alleged harassment he suffered can be found in his response to defendant's interrogatories:

> I believe that my termination from employment with Campbell Engineering may in part be the result of my complaints concerning the on-the-job racial slurs ("boy", "nigger", "black bitch", "you people") I endured from several white employees, including Leonard Rogers and Donald Bailey.[31]  These slurs were ongoing such that I am unable to particularize or describe each one individually. ... According to what I was told by Johnny Humphrey and Trea Gilbreath, Mr. Rogers once circulated a flyer around the plant which had circles around the heads of black persons drawn on the flyer, and the black persons were referred to as "Leonard's people".  I personally complained about the slurs to not only Liz Nunley, who I believe was the Human Resources Manager, but also to Dr. Richard Campbell himself.  In spite of my complaints, the racial slurs were allowed to continue. Other witnesses to racial slurs are Trea Gilbreath and Johnny Humphrey.[32]

While Gilbreath's deposition testimony somewhat supports Nance's allegations, it fails to indicate that the use of racial slurs, jokes, or puns was sufficiently severe or pervasive as to alter the terms and conditions of Nance's employment.  The only specific

---

[31] For the reasons set forth *supra* at note 22, this court does not construe Nance's choice of words in the preceding sentence to state a claim of retaliation under the "opposition" clause of 42 U.S.C. § 2000e-3(a).

[32] Exhibit 5 to plaintiff's evidentiary submission in opposition to summary judgment.

instance of racial harassment Nance recalled in deposition was when Bailey referred to him as a "black bitch."[33]   However, after discussing the problem with Nunley, Bailey apologized to Nance, stating that he was only joking.  Further, Campbell's affidavit and Nance's response to defendant's interrogatories establish that Nance was not even employed by Campbell Engineering when the "Leonard's Crew" incident occurred.[34]

Viewing the facts in the light most favorable to Nance, it cannot be doubted that use of such scurrilous slurs as "nigger," "you people," and "boy" by some Caucasian employees was crude, offensive, and absolutely inexcusable.  Moreover, such statements unquestionably are "serious" and "severe" to a person of African-American heritage.  The problem lies in the fact that Nance has

---

[33] Nance also pinpointed in deposition an incident when he complained to Richard Campbell that Leonard Rogers "was constantly telling me to come to work and do this and do that."  Nance deposition at 241.  Campbell met with Nance, Rogers, and Johnny Humphrey and, according to Nance, "pretty much got them straightened."  *Id.*  Nance's testimony on this incident is far from clear or specific, and to the extent it could be construed as another instance of racial harassment, it is directly refuted by Richard Campbell:  "At no time during Mr. Nance's employment did he or any other African American employee of Campbell Engineering make any complaints or comments to me concerning any allegation of racial discrimination or harassment."  Campbell affidavit ¶ 33.  Nonetheless, this court finds the incident is not reflective of a racially discriminatory animus harbored by Rogers.  Rather, Nance seemed to be complaining about the fact that Rogers, instead of Humphrey, was delegating work assignments to him.  Nance has not alleged that this conduct impacted his work performance.

[34] Trea Gilbreath stated in deposition that he thought Nance was employed by Campbell Engineering at the time of that incident.  Nance's statement that he "was told" of the incident by Gilbreath and Humphrey, along with his remark in deposition that he had never seen the drawing, refutes Gilbreath's assertion.

failed to demonstrate either that his workplace was permeated with such verbal filth, or that such racially offensive statements interfered with his work. *See Meritor Savings* Bank, 477 U.S. at 67, 106 S.Ct. at 2405 (noting that the "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee'" is not actionable) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)); *Hopkins v. Baltimore Gas and Electric Company*, 77 F.3d 745, 753 (4th Cir. 1996) ("Title VII does not attempt 'to purge the workplace of vulgarity ....'") (quoting *Baskerville v. Culligan International Company*, 50 F.3d 428, 430 (7th Cir. 1996)); *Johnson v. Hondo, Inc.*, 940 F. Supp. 1403, 1410 (E.D. Wis. 1996) (when enacting Title VII, Congress did not "expect employers to purify the language in the workplace or remove all vulgarity or coarse comments"). In fact, other claims made by Nance in this litigation refute the theory that such harassment interfered with his work performance. Specifically, Nance has consistently asserted that the carpentry projects he performed for Campbell Engineering met or exceeded expectations. Nance even submitted an expert's report indicating that his "carpentry skills are at a minimum adequate and probably good," and that he "pays

attention to details in his work."[35]    Those statements and
allegations confirm that Nance has not stated an actionable claim
for racial harassment under Title VII and Section 1981, because he
has not linked those statements to any detrimental effect on his
work performance.    Accordingly, summary judgment is due to be
granted.

**B.    Fair Labor Standards Act Claim**

The evidence in this case fails to reflect that Nance has
stated a claim upon which relief can be granted under the Fair
Labor Standards Act.    *See* 29 U.S.C. § 206(d)(1) ("No employer
having employees subject to any provisions of this section shall
discriminate ... on the basis of <u>sex</u> by paying wages to employees
in such establishment at a rate less than the rate at which he pays
wages to employees of the opposite sex ....") (emphasis supplied);
*Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th
Cir. 1992) (noting that Equal Pay Act, which is a portion of the
Fair Labor Standards Act, "was directed only at wage discrimination
between the sexes and forbids the specific practice of paying
unequal wages for equal work to employees of the opposite sex");
American Bar Association Section of Labor & Employment Law,

---

[35] Affidavit of Jimmy Pope, attached as Exhibit 2 to plaintiff's
evidentiary submission in opposition to summary judgment, at unnumbered page 2.

26

*Employee Benefits Law* 592 (1991) ("The Fair Labor Standards Act establishes a minimum hourly wage and a maximum work week.  Through its equal pay provisions the Act prohibits wage differentials for equal work on account of the sex of the employee.") (footnotes omitted).  In his brief in opposition to summary judgment, Nance did not address the propriety of such a claim, in effect conceding to Campbell Engineering's argument that "Nance's complaint makes no allegation of facts that would support a claim under the Fair Labor Standards Act and, in any event, he has presented no supportive evidence of any such claim."[36]  Accordingly, summary judgment on that claim also is due to be granted.

### IV. CONCLUSION

For the foregoing reasons, defendant's renewed motion for summary judgment is due to be granted as to all of plaintiff's claims.  An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this 14th day of April, 2000.

_____
United States District Judge

---

[36] Defendant's brief in support of defendant's renewed motion for summary judgment (Doc. No. 45), at 36.

27